Kevin T. Lafky, OSB #852633
klafky@lafky.com
LAFKY & LAFKY
429 Court Street NE
Salem, OR 97301
Tel: (503)585-2450
Fax: (503)585-0205
Attorney for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

Eugene Division

| | |
|---|---|
| MARTIN G. CHILDS, | Case No. 6:20-cv-01610-MK |
| Plaintiff, | THIRD AMENDED COMPLAINT |
| | False Claims Act Qui Tam Whistle blower |
| v. | Claim 31 U.S.C. 3729-3733 |
| SEIU LOCAL 503, OPEU, and SERVICE EMPLOYEES INTERNATIONAL UNION (SEIU); | 18 USCA § 1347 |
| | (Jury Trial Requested; Not Subject to Mandatory Arbitration) |
| Defendant. | Requested Relief: $125,354,208.00 |

Plaintiff Martin G. Childs ("Plaintiff") alleges, at all material times herein:

**PARTIES**

1.

Plaintiff is a resident of Lane County, Oregon.

2.

Defendant Service Employees International Union ("Defendant") is a labor union that represents workers all across the United States, Canada and Puerto Rico.

Page 1- THIRD AMENDED COMPLAINT

Defendant SEIU Local 503, OPEU is a labor union that represents Oregon Public employees and healthcare providers.

## JURISDICTION

3.

Plaintiff asserts a claim for a violation of the False Claims Act under 31 U.S.C. § 3729(a)(1)(A), acting as a private citizen bringing an action under U.S.C. § 3730(b)(1). Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, federal question jurisdiction, and brought pursuant to a claim under 31 U.S.C. § 3730(b)(1) in the name of the Government.

## VENUE

4.

Venue is appropriate in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events or omissions giving rise to the claims asserted in this Complaint occurred while Plaintiff worked at SEIU Local 503, OPEU in Salem, an affiliated local union chartered by the Defendant. Plaintiff was living in Lane County, Oregon working for SEIU Local 503, OPEU. Defendant has approximately 2 million members of which there are members in the state of Oregon and throughout the United States, as well as in Canada and Puerto Rico.

## FACTUAL ALLEGATIONS

5.

Plaintiff worked for SEIU Local 503, OPEU as the Finance Director and attended Finance Director conferences provided by the Defendant from September of 2009 until he was eventually pressured into an early retirement in June of 2019. Plaintiff served as Ethics Liaison until April of 2016 and attended Ethics Liaison conferences provided by the Defendant until that

Page 2- THIRD AMENDED COMPLAINT

time. After serving as the Ethics Liaison for over five years it was brought to Plaintiff's attention that Executive Director of SEIU Local 503, OPEU Heather Conroy calculated and approved substantially more severance pay than was allowed to the outgoing Political Director. Plaintiff made an inquiry to auditors to obtain their opinion before considering whether to report it, to which the auditors were told it was "strategic." Shortly after that the Plaintiff's job title was changed from Finance Director to Finance Coordinator and at the beginning of 2016 a change was made to the Defendant's Ethics Code for all its affiliated unions to which Finance Directors were no longer eligible to be Ethics Liaisons.

6.

Plaintiff's position allowed him to be a witness to the creation of related party trusts for SEIU Local 503, OPEU. It was common knowledge within the union that there was great concern over several negative SCOTUS decisions which directly impacted dues revenue. The Defendant and its leadership discussed these concerns at conferences the Plaintiff attended. There was anxiety regarding an expected future decision negating dues deductions from paychecks by state agencies. This would force unions to collect dues from each individual union member who would be willing to provide them with their banking information. The Plaintiff attended meetings in which work with payment software companies was strategized. However, if deductions of dues from paychecks were not allowed to be passed on to unions, then the contact data of each dues payer would also not be passed on, creating a greater problem in that the Defendant's unions would be unable to obtain fresh contact information to encourage individual dues payments. It was at that time that an alternative

path began to move forward to gain access to worker data through related party trusts the Defendant's unions controlled.

7.

Other affiliated unions under the Defendant's umbrella outside of Washington and Oregon created health insurance trusts for homecare workers and training trusts for members that were funded from union dues, but the model SEIU Local 503, OPEU chose to follow was one created by SEIU Local 775 headquartered in Seattle, Washington. There the union created homecare insurance trusts and lobbied for a ballot initiative for required homecare worker training. SEIU Local 775 created a pipeline in 2010 of Medicaid dollars flowing from their trusts to the union. In a decade of collecting these funds the annual receipts from these trusts increased from $1.3 million per year to over $3.3 million. Before Local 503 could duplicate Washington's model they would require a larger building for a call center and create the same types of trusts through which they could gain access to Medicaid revenue and worker contact data.

8.

Heather Conroy became Executive Director of SEIU Local 503, OPEU in 2010. In October of 2013 two homecare health insurance trusts were created. In 2016 she followed the previous Executive Director to SEIU in Washington, D.C. to become part of their executive leadership team, though she continued to reside in Portland, Oregon. Brian Rudiger became Executive Director in 2017 and created a building trust for which Local 503's real estate assets would be held. He resigned in 2017 to direct the lobbying efforts for SB 1534 which mandated the state of Oregon, specifically the Oregon Home Care Commission (OHCC), to set standards for required training of care providers while maximizing federal funding to pay for it. In 2018 the Training Partnership Trust was created

with the new Executive Director, Melissa Unger, serving as trustee with two homecare union members. Although the state already had a care provider training program in place that reports to the OHCC, after the bill's passage the work to develop the training curriculum and provide the training went to Local 503's training trust which would be funded with state-controlled Medicaid funds. Brian Rudiger would now go from lobbying for the SB's passage to being the Executive Director for the training trust. The state of Oregon has a bidding system called ORPIN through which vendors can compete for a contract, which lists all contracts rewarded online for the public to view and removes any impression of bias or favoritism. The contract awarded to Local 503's training trust is not publicly visible. After Local 503 purchased The Forum Building in Portland, and after the Plaintiff had been forced from his position in the union, Mr. Rudiger awarded SEIU Local 503, OPEU the contract for call center work which was to be paid for by the training trust, which was funded with Medicaid dollars.

9.

The matter of establishing the call center within the union so it can be awarded a contract from the training trust is in contrast to how the homecare insurance trusts were set up. The homecare insurance trusts do not contract out their worker contact calling. Instead, they hire those staff during insurance signups and manage that effort within the trust. No funds nor any member contact information is sent to the union for call center work; it is embedded in the trust.

10.

Plaintiff found in the OHCC minutes published online that the commissioners discovered that SEIU Local 503, OPEU staff created a Registry database of homecare workers contact information. They were offended and surprised that this was being done because the OHCC is

Page 5- THIRD AMENDED COMPLAINT

mandated by the state constitution to maintain the Registry of these homecare workers. The Plaintiff also found online an article to which Mr. Rudiger states the possibility of eventually expanding the required orientations and training for state agency employees. These employees are another union sector of the Defendant.

11.

After the Training Partnership Trust was created SEIU Local 503, OPEU purchased The Forum Building in Portland that would provide enough room for a call center. This was done in February of 2019. The Director of the call center was hired months before the call center contract was awarded. Melissa Unger presented a budget plan to Local 503 staff that included revenue for a call center even though it was weeks before it was awarded the contract. Local 503 did not have the funds to purchase a building with a sale price of $17,500,000 so they pulled funds from one of the Homecare Health Insurance trusts to make a cash payment and reduce the amount financed. The total amount pulled from this trust account, which is funded by the state with Medicaid funds, was $7,888,347. During their fiscal years 2020 and 2021 they have pulled an additional $2,769,302 to pay for building improvement expenditures, which is a total of $10,657,649 taken from the Homecare Insurance Trust. On the trust's tax report this is listed as an investment; however, this is a non-liquid asset and would require much more effort and expense to liquidate their interest, not to mention the risk in real estate investing seen since 2008. By investing this much in a single asset the portfolio is not diversified at all and puts it at a higher risk than if it had placed the money in several mutual funds. Finally, the health insurance trusts were established with a Declaration of Trust signed by Heather Conroy which stipulates the following fiduciary requirements: (1) Management of and responsibility for the trusts be shared equally amongst five union trustees and

five trustees representing the state of Oregon, each group with one vote each; (2) The administration of the trusts must only be for the exclusive benefit of the plan participants and their dependents; (3) Under no circumstances can any trust assets be used to benefit either SEIU Local 503, OPEU or the state of Oregon. Theses fiduciary requirements set forth in the Declaration of Trust were broken by a conflict of interest from the union trustees.

12.

Defendant requires each affiliated local union under its umbrella to email them each year an ethics report, the year-end financial statements, the audit report, and the LM-2 report that is filed with the U.S. Dept. of Labor. The LM-2 is a type of financial report that provides more detail, especially on receipts and expenditures. The Defendant reviews these reports and meets regularly with Executive Directors several times each year to get information on projects. Some Executive Directors serve on committees run by the Defendant. Both former Executive Directors from SEIU Local 503, OPEU who are now working for the Defendant now work directly with union staff within the sectors they have been assigned on projects that are developed and guided by the Defendant's executive management. Before he was forced out, the Plaintiff asked Melissa Unger, Executive Director for SEIU Local 503, OPEU, about the purchase of the building and her response was that she and others had worked with staff and attorneys for the Defendant during many conference calls prior to finalization of the purchase. Each union pays "per caps" payments to the Defendant and in return is provided with project leadership and consultations on achieving goals of the Defendant. During the political season the Defendant will often request union staff from various states to assist with political work in states that need help. The Defendant will also reciprocate by providing their own personnel to work on-site with affiliated union staff.

Page 7- THIRD AMENDED COMPLAINT

13.

To attain the access to funding articulated above, SEIU Local 503 lobbied to create a training trust structure similar to SEIU Local 775's to expand their access to Medicaid. This included getting the state legislature to pass a bill for newly imposed training requirements with the goal to receive additional Medicaid funding. Presumably, their goal was to submit a bid to provide administrative support for a fee, submitted that to its training trust which it controlled, and gained access to Medicaid funds to cover this fee, as well as offset expenses they were already paying for, all while gaining a new source of Medicaid revenue.

14.

This access to Medicaid funds was also utilized in the Defendant's acquisition of The Forum building in Portland to be used as a call center, among other things. This building is locate at 525 NE Oregon Street, Portland, OR 97232 and is owned by Defendant SEIU Local 503 to this day after being acquired in 2019. Defendant looked to acquire a 55,000 square foot building with land space that could be sold to developers in one of Portland's most sought after districts. To ensure it received this building, Defendant wired $300,000 in an earnest money deposit and an additional $200,000 from one of SEIU Local 503's health benefit trusts, the Oregon Homecare Workers Supplemental Trust. These payments were made in December 2018 and February 2019, at the direction of Heather Conroy, Melissa Unger, and the rest of the Steering committee of SEIU Local 503. The first bank that the Defendant had used to support the purchase pulled out, throwing the deal into jeopardy. Defendant located another bank, Heritage Bank, which was willing to support the purchase. Defendant used cash being held by the Oregon Homecare Workers Benefit Trust and the Oregon Homecare Workers Supplemental Trust, totaling $7,688,346.50, to support the transaction. These

trusts were set-up in 2013 to provide home care workers with health insurance and both trusts contained Medicaid dollars. This was not done in an attempt to benefit the participants and only benefitted Defendant.

15.

The purchase of The Forum building described above was not properly disclosed and was not recorded as a loan for the use of substantial Medicaid funds. Improvements to the building were also made and came out of Medicaid funding resources, totaling $2,769,302. This building could result in other alternative revenue streams as well, purchased with Medicaid funding.

16.

By the end of 2021, SEIU Local 775 has billed roughly $26,936,227 of Medicaid funding between both the healthcare and training trusts, not including what was pulled for the 2022 calendar year by the chapter. By the end of fiscal year 2021, SEIU Local 503 had billed roughly $4,190,860 to both trusts, along with the amount articulated above for the purchase of the Forum Building. Through the improper use of the healthcare and training trusts as articulated above, In total, Defendant has defrauded the government in an amount at or around $41,784,736, not including whatever amount was pulled for the 2022 calendar year. These trusts were created for the sole benefit of participants and utilized illegal practices to gain access to Medicaid funds to offset its own expenses.

17.

Defendant operated the Oregon Homecare Workers Benefit Trust pursuant to the Agreement and Declaration of Trust, established in 2013. Sections 5.2(c) of the Agreement imposes the duty on the defendant to administer the trust for the exclusive benefit of the

members. Section 10.3 reiterates and expands on this duty by making clear that no amendment to the agreement shall allow the trust funds to be diverted to purposes other than the benefit participants and dependants and that no portion of the fund shall be allowed to revert or accrue to the Defendant.

18.

Defendant Local 503 violated 42 U.S. Code § 1395g (c) and 42 U.S. Code § 1395u(b)(6) by using the medicaid funds in the Oregon Workers Homecare Benefit Trust and the Homecare Workers Supplemental Trust to acquire the Forum Building. In the case of the Oregon Workers Homecare Benefit Trust, the use of these funds for this transaction was not supported by the existing Agreement and Declaration governing the trust. It was entirely unrelated to the purpose of benefitting the participants and instead wholly benefitted the defendant organization.

19.

Defendant defrauded the Federal government by receiving payments of benefits into the healthcare trust that purported to be backed by a valid assignment of rights under the trust Agreement. However the Defendant Organization did not meet this requirement as it was in breach of its fiduciary duties under the Trust agreement by spending trust funds for purposes that were not authorized by the agreement. This fraudulent scheme allowed defendant to obtain benefits under false pretenses and use them for its own personal gain and not the member beneficiaries of the trusts.

20.

On its 2019 LM-2 form disclosures, SEIU Local 503 reported "reimbursements" totaling $342,507 paid into the SEIU 503 Training Partnership, which was classified as providing "Caregiver Training," dated September 17, 2019.

21.

On its 2020 LM-2 form disclosures, SEIU Local 503 reported three payments for "Cash Needs Payment" from the OR Homecare Workers Supplemental Trust, two transactions were dated for October 30, 2019 for $49,492 and $61,840 respectively. A third payment was dated January 13, 2020 for $87,779. These payments totaled $199,111.

22.

On its 2021 LM-2 form disclosures, SEIU Local 503 reported a payment of $126,932 into the OR HC Workers Supp Trust, dated April 19, 2021 for "Admin Support"

23.

These amounts reimbursed to the trust with federal funds constituted false certifications to the Federal Government by SEIU, because the funds were paid out of medicaid program funds by the State of Oregon. These funds had not been used for Caregiver Training, Cash Needs Payments, or Admin support. They were used, either wholly or in part, to provide earnest money deposits, and later on to provide improvements for the Forum Building acquisition, the purpose of which was to benefit SEIU Local 503.

**False Claims Act Qui Tam Whistle Blower Claim**
**31 U.S.C. § 3729**

24.

Plaintiff re-alleges and incorporates paragraphs 1 through 23 herein by this reference.

25.

According to 31 U.S.C. § 3729, Any person who knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval is liable to the government for a civil

Page 11- THIRD AMENDED COMPLAINT

penalty of not less than $5,000 and not more than $10,000, as adjusted by the Federal Civil Penalties Inflation Adjustment Act of 1990, plus 3 times the amount of damages which the Government sustains because of the act of that person.

26.

Although Plaintiff is not the government, a person may bring a civil action for a violation of 31 U.S.C. § 3729(a)(1)(A) for the person and for the government's benefit. The action shall be brought in the name of the Government. Plaintiff shall be entitled to between 25-30% of the proceeds recovered, depending on government involvement. 31 U.S.C. § 3730(d)(1)-(2). As Defendant defrauded the government of $41,784,736. According to 31 U.S.C. § 3279(a)(1), the damages to be received by the government are multiplied by 3, resulting in $125,354,208 plus the civil penalty. The statutory scheme allows for plaintiffs to recover 30% of the damages sustained, depending on government participation in the suit. Pursuant to 31 U.S.C. § 3730(d)(1)-(2), Plaintiff shall also be entitled to receive his reasonable attorneys fees and costs should he prevail.

27.

Through the use of the trusts set-up by Defendant through Local SEIU 775 and 503, it has been able to increase its revenue from Medicaid funds substantially and has utilized this to benefit itself in direct violation of the trusts purpose. As Defendant used these funds to profit from the government and purchase income-producing property, it has continually presented false claims for payment.

WHEREFORE, Plaintiff requests the following for his claims for relief:

> 1. For Plaintiff's First Claim of Relief against Defendant: The government is to receive a total $125,354,208 which is 3 times the amount of damages sustained due

to Defendant's conduct. Pursuant to 31 U.S.C. § 3730(d)(1)-(2), Plaintiff is entitled to receive up to 30% of this amount, depending on government participation;

2. Plaintiff's reasonable attorneys fees and costs pursuant to 31 U.S.C. § 3730(d)(1)-(2); and

3. Any other relief this court deems just and equitable.

DATED this 21rd day of December, 2022.

                                        */s/ Kevin T. Lafky*
                                        Kevin T. Lafky, OSB#852633
                                        LAFKY & LAFKY
                                        429 Court Street NE
                                        Salem, OR 97301
                                        (503)585-2450
                                        Of Attorney for Plaintiff